FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BLUE GENTIAN, LLC,** | |
| **Plaintiff,** | **Civil Action No. 13-481 (FSH)** |
| **v.** | |
| **TELEBRANDS CORP.,** | **OPINION** |
| **Defendant.** | |

PRESENTLY BEFORE the Court is a Motion to Amend by Plaintiff, Blue Gentian, LLC ("Blue Gentian").  Docket Entry No. 55.  Blue Gentian seeks to join its licensee, National Express, Inc., ("NEI") as co-plaintiff and to amend its pleadings to add claims for indirect patent infringement.  Defendant, Telebrands Corps. ("Telebrands"), opposes Blue Gentian's motion, arguing that NEI lacks standing to join the matter to assert patent infringement claims.  Docket Entry No. 57.  The Court considers the arguments of the parties without oral argument pursuant to L.Civ.R. 78.1(b).  For the reasons set forth below, Blue Gentian's Motion to Amend is granted.

### I.      Procedural History

The underlying action is one of five cases presently consolidated before this Court relating to two United States patents: U.S. Patent No. 8,291,941 ("the '941 patent") and U.S. Patent No. 8,291,942 ("the '942 patent").[1]  The patents are owned by Blue Gentian, and are

---

[1] Of the five cases, three involve Telebrands: the instant case, Civil Action 12-6671, and Civil Actions 13-481 and 13-4627.

Civil Action No. 12-6671 is a mirror patent infringement action that was filed by Telebrands against Blue Gentian, NEI, and inventor Michael Berardi.  In that case, NEI has filed a Motion to Amend its Answer to add patent infringement counterclaims.  *See* Docket Entry No. 86.  Telebrands opposes the motion on the same standing grounds discussed herein.

**FILED UNDER SEAL**

purported to cover an expandable and contractible hose, marketed by Blue Gentian under the name "Xhose."  *See* proposed Second Amended Complaint ("SAC") ¶¶8-9, Docket Entry No. 55.  NEI is a licensee of Blue Gentian.  SAC ¶10.  Pursuant to their licensing agreement ("Agreement") and amendment to the Agreement ("Amendment"), Blue Gentian granted NEI various rights "to make, use, sell, offer for sale, import, market, promote and/or distribute expandable/retractable hoses embodying the inventions disclosed in the '941 and '942 patents, within certain non-geographic markets."  SAC ¶10.  Telebrands markets a competing hose product called Pocket Hose, which is alleged to infringe on the '941 and '942 patents.  SAC ¶12.  Blue Gentian asserts that Telebrands sells its competing hose in the markets which were licensed to NEI.  SAC ¶10.

On or about October 23, 2013, Blue Gentian filed this action against Telebrands Corp. for patent infringement of the '941 and '942 patents in the Southern District of Florida.  *See* Docket Entry No. 1.  On November 15, 2012, Telebrands filed a motion to transfer the case to the District of New Jersey, where Telebrands had filed a mirror patent infringement declaratory judgment action, Civil Action 12-6671.  *See* Docket Entry No. 9.  On January 24, 2013, the court granted Telebrands Motion to Transfer.  See Docket Entry No. 37.

The Court conducted an initial conference in the instant case on March 15, 2013, and entered a scheduling order.  *See* Docket Entry No. 45.  As subsequent related cases were filed, the Court consolidated the actions and adjusted the scheduling orders for all of the Xhose patent litigation cases.  *See* Docket Entry No. 48.  However, a clerical error and discovery problems

---

Civil Action No. 13-4627 is also an infringement action filed by Blue Gentian and National Express on or about July 31, 2013, against Telebrands, Bed, Bath & Beyond, Wal-Mart Stores, Inc., the Walgreen Company, Rite-Aid Corporation, and Telebrands' president, Ajit Khubani, asserting claims for patent infringement of a new related patent, U.S. Patent No. 8,479,776 ("the '776 patent"), as well as asserting claims under the '941 and '942 patents against the new Defendants. Telebrands filed a motion to dismiss NEI on the same standings grounds.  *See* Docket Entry No. 23.

2

**FILED UNDER SEAL**

disrupted the schedule, and on May 15, 2013, the then-assigned Magistrate Judge stayed

discovery until the parties could confer on a new schedule.  *See* Docket Entry No. 50.

On June 20, 2013, while the discovery schedule was stayed, Blue Gentian filed the

instant motion to amend to join NEI and to add claims for indirect patent infringement.  *See* Blue

Gentian's Brief ("Blue Gentian's Br.") at 1.  Blue Gentian argues that joining NEI will not cause

any prejudice since the proposed claims are parallel to those counterclaims already asserted by

Blue Gentian.  *Id.* at 3.  Blue Gentian also states there is no delay because the scheduling orders

were stayed pending the parties' conference on proposed new dates.  *Id.* at 3.  Telebrands

opposes the motion on the grounds of futility because NEI lacks standing to bring a claim for

patent infringement.  *See* Telebrands' Opposition ("Opp.") at Docket Entry No. 57.

On November 21, 2013, a new scheduling order was entered which consolidated the fifth

case and set a new discovery schedule for all pending cases.  *See* Docket Entry No. 74.  The date

for the filing of any motions to amend or join new parties was set for March 13, 2014.  *Id.*

## II.     Background[2]

On or about July 12, 2012, Blue Gentian entered into a licensing agreement with NEI

under the '941 and '942 patents to manufacture, market, and sell the Xhose product.  *See*

Countercl. ¶10; Agreement at Docket Entry No. 90-1.[3]  Pursuant to Section 2.1 of the

Agreement, Blue Gentian

> grant[ed] to NEI, upon and subject to all the terms and conditions
> of this Agreement, a royalty-bearing, exclusive license, including
> the right to sublicense, under the Licensed Patents and the

---

[2] For purposes of this motion only, the Court takes the facts alleged in the proposed Amended Answer and
Counterclaims as true. *Travelers Indem. Co., v. Dammann & Co.*, 592 F. Supp.2d 752, 763 (D.N.J. 2008).

[3] The Court notes that the parties have filed the Agreement and Amendment under seal and all reference to the
Agreements and Amendments in their papers have been redacted, subject to the Court's ruling on the related motion
to seal at Docket Entry No. 89.

FILED UNDER SEAL

> Licensed Trademarks to make (or have made), use, sell, offer for sale, import, market promote, and/or distribute Licensed Products in the DTC [Direct to Consumer] Market and the Retail Market in the Territory."

*Id.*

The Agreement applied worldwide and delineated the parties' respective fields of operation as certain defined markets. *See id.* ¶¶1.6 & 1.8. Paragraph 1.8 identified five different markets:

> 1.8 The relevant markets in which Licensed Products will be marketed, promoted, distributed and sold pursuant to this Agreement are as follows:
>
> 1.8.1 The "Direct to Consumer ('DTC') Market" shall refer to sales of Licensed Products offered or made through television, print, mail order and/or internet channels to end users of Licensed Products.
>
> 1.8.2 The "Retail Market" shall refer to large and small retailers. By way of example and not by limitation, such retailers include Wal-Mart, CVS, and Bed Bath & Beyond.
>
> 1.8.3 The "Commercial Market" shall refer to sales of Licensed Products offered or made to businesses, agencies, institutions, commercial contractors or commercial contractor distributors. The "Commercial Market" does not include retailers or websites selling directly to consumers. It is understood that Licensed Product sold to the Commercial Market shall be manufactured with materials sued for commercial use, as opposed to materials suited only for home use by individual consumers.
>
> 1.8.4 The "Premium Market" shall refer to sales of Licensed Products offered or made to businesses agencies, institutions or commercial contractors that intent to sue Licensed Products with their respective names, logos or other custom indicia other than a Licensed Trademark thereon, and do not intend to re-sell a Licensed Product to end retail consumers. The "Premium Market" does not include retailers or websites selling directly to consumers.
>
> 1.8.5 The "Live Show Market" shall refer to sales of Licensed Products offered or made at shows, conventions or events

4

**FILED UNDER SEAL**

> including, without limitation, home shows, boat shows, RV shows,
> or trade shows.

*Id.*

NEI was limited to practicing its rights in the DTC and Retail Markets, and in fact paragraphs 2.2 and 2.3 explicitly forbid NEI to "directly or indirectly manufacture, have manufactured, sell or distribute Licensed Products to or for any person or entity" in the Commercial, Premium, or Live Show Markets without the prior consent of Blue Gentian. *Id.*

The remainder of the Agreement set out other rights and restrictions on NEI's ability to practice the patent rights. For example, Blue Gentian retained the right to review products by NEI's manufacturer and the right to audit NEI's books. *See* Agreement ¶¶2.1.3 & 4.1. Blue Gentian also explicitly retained the ownership of all intellectual property, including any modifications designed by NEI. *See* Agreement ¶¶5.1 & 5.2.1.

While the ownership of all intellectual property rights remained with Blue Gentian, the Agreement allotted both Blue Gentian and NEI rights to initiate and participate in infringement suits. *See* ¶¶5.4, 5.4.2 & 5.4.3. The provisions are nearly identical, with Blue Gentian granting itself the option, but not the obligation, to initiate suits:

> 5.4.2 BG [Blue Gentian] shall have the right, but not obligation, to bring suit at its own expense to prevent such infringement and to recover profits and damages therefrom. NEI agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BG's expense. If BG decides to undertake such suit, then BG shall have the sole right to control prosecution, and the right to settle and compromise such action with NEI's prior written consent, which shall not be unreasonably withheld.
>
> 5.4.3 NEI shall also have the right, at its sole discretion, to bring suit at its own expense to prevent infringement of the Licensed Patents and to recover profits, damages, and any and all other available remedies therefrom. BG agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is

**FILED UNDER SEAL**

> reasonably necessary, at NEI's expense.  BG shall cooperate with
> NEI as is reasonably necessary in any such action brought by NEI.
> If NEI brings legal action, NEI shall have the sole right to control
> prosecution, and the right to settle and compromise such action
> with BG's prior written consent, which shall not be unreasonably
> withheld.

*Id.*

The Agreement also allowed both parties the ability to transfer their respective rights. Paragraph 2.1 granted NEI the right to sublicense.  Paragraph 12.4 granted the parties mutually limited rights to assign their interests under the patents.  Subject to certain events such as a sale of all assets, merger, or reorganization, "no Party [could] assign any rights or delegate any duties under this Agreement without the other's prior written consent, and any such attempted assignment or delegation without such consent will be void."

On or about March 5, 2013, the parties executed an Amendment to the Agreement that modified the markets in which each party sells.  *See* Amendment at Docket Entry No. 90-1. Specifically, the Amendment grants to NEI the ability to sell in all defined markets in territories outside the United States.  *Id.*  Additionally, the Amendment recognizes that the parties' mutual wish for NEI "to grant certain rights in international territories under [Blue Gentian's] intellectual property" to a third party distribution company.[4]  *Id.* at ¶1.  The Amendment clarified that Blue Gentian did not cede any rights for the Commercial, Premium, or Live Show Market

---

[4] Paragraph 2.1, the scope of the license, was rescinded and replaced.  Under the new terms, Blue Gentian granted NEI additional rights under the patents for "a royalty-bearing, exclusive license, including the right to sublicense, under the Licensed Patents and the Licensed Trademarks to make (or have made), use, sell, offer for sale, import, market, promote, and/or distribute Licensed Products in the Premium Market, Live Show Market, and the Commercial Market in the Territory except for the United States."  *Id.* at ¶1.  NEI's new license granted rights in NEI's international territories.

**FILED UNDER SEAL**

within the United States. *Id.* at ¶1. Any paragraphs that reflected the prior limited markets were likewise rescinded and replaced.[5] *See id.*

### III.    Statement of Law

*A.  Motion to Amend*

Leave to amend a pleading is governed by Fed.R.Civ.P. 15, and generally is granted freely. *See* Fed.R.Civ.P. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000). Nevertheless, the Court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman,* 371 U.S. at 182.

An amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face." *Harrison Beverage Co. v. Dribeck Imp., Inc.,* 133 F.R.D. 463, 468 (D.N.J. 1990)(internal quotation marks and citations omitted). The court uses "the same standard of legal sufficiency" as a motion to dismiss under Rule 12(b)(6). *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

When faced with a motion to dismiss for failure to state a claim, the court conducts a two-step analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual elements from the legal elements of the claim. *Id.* at 210-11. The court must accept the factual elements alleged in the well-pleaded complaint as true, but may disregard any legal conclusions. *Id.*

---

[5] As the provisions in the Amendment only expand NEI's territory without the United States, the Amendment has little impact on the analysis as stated herein. As such, the Court refers to the original Agreement. Any analysis would equally apply to the new provisions in the Amendment.

**FILED UNDER SEAL**

Second, the court must decide if the facts alleged are sufficient to show a "plausible claim for relief." *Fowler*, 578 F.3d at 210 (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1955 (2009)). "Ultimately, this two-part analysis is 'context specific' and requires the court to draw on 'its judicial experience and common sense' to determine if the facts pled in the complaint have 'nudged [plaintiff's] claims' over the line from '[merely] conceivable or [possible] to plausible.'" *Hobson v St. Luke's Hospital and Health Network*, 735 F.Supp.2d 206, 211 (E.D. Pa. 2010)(quoting *Fowler*, 578 F.3d at 211).

In considering a motion to dismiss, the court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the claims are based upon those documents. *See Pension Benefits Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* at 1196.

Here, Telebrands attached the Agreement and Amendment as an exhibit to its Opposition to the Motion to Amend. *See* Exhibit 1 to Opp. While Telebrands states in a footnote that NEI and Blue Gentian have produced different versions of the Agreement, *see* Opp. at 2, n.1, both parties extensively discuss and rely on the Agreement and Amendment attached as Exhibit 1 in the underlying claims and the instant motion. Accordingly, the Court will examine the terms of the Agreement and Amendment where necessary.

### B. Standing in Patent Infringement Litigation

The Patent Act of 1952 confers on the patentee, and its successors in title, the right to sue for patent infringement. *See* 35 U.S.C. §§ 281 & 100(d). In certain circumstances, the right to

**FILED UNDER SEAL**

sue also transfers from the patentee to its assignees or licensees.  *See Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891).  Courts generally recognize three categories of licensee.

The first category consists of those licensees who are assigned "all substantial rights" under the patent.  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991).  The assignment transfers enough of the legal title of the patent to the assignee so that the assignee becomes in effect the patentee.  *Textile Productions, Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998)(citing *Vaupel*, 944 F.2d at 874-75).  Licensees with substantial rights may then sue in their own name, without joining the patent holder.  *Intellectual Property Dev. Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001).

The second category consists of the "exclusive licensee."  An exclusive licensee has fewer than all substantial rights, but still has a proprietary interest in the patent because it was granted the right to exclude.  *WiAV Solutions LLC. v. Motorola*, 631 F.3d 1257, 1266 (Fed. Cir. 2010)("[A] licensee is an exclusive licensee of a patent if it holds any of the exclusionary rights that accompany a patent)."  The "right to exclude is the legal interest created by statute…. Constitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented invention that violates these exclusionary rights."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007) (internal citations omitted); *WiAV Solutions*, 631 F.3d at 1264 ("[A] party has the right to sue for infringement of the patent if that party has a legally protected interest in the patent related by the Patent Act, so that it can be said to suffer legal injury from the [act] of infringement.")(citing *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007)).

**FILED UNDER SEAL**

While the exclusive licensee meets the injury in fact threshold of constitutional standing, for considerations of prudential standing, the licensee must join the patentee as co-plaintiff.[6]  *See International Gamco, Inc., v. Multimedia Games, Inc.*, 504 F.3d 1273, 1278-79 (Fed. Cir. 2007). The prudential standing requirement addresses the policy concern that an alleged infringer would otherwise be subject to a multiplicity of suits over a single act of infringement.  *Id.* at 1279; *see also Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459, 468 (1926) ("The presence of the patent owner as a party…enable[s] the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in one action, or by satisfying one adverse decree to bar all subsequent actions.")

The third category is that of the "bare licensee."  The bare licensee was granted only the ability to practice the patent, without rights to exclude, and thus lacks the constitutional standing to sue for infringement.  *See Morrow*, 499 F.3d at 1340-41; *see also WiAV Solutions*, 631 F.3d at 1265; *Rite-Hite Corp. v. Kelley Co., Inc*, 56 F.3d 1538, 1552 (Fed. Cir. 1995)("If the party has not received an express or implied promise of exclusivity under the patent, *i.e.*, the right to exclude others from making, using, or selling the patented invention, the party has a 'bare license,' and has received only the patentee's promise that that party will not be sued for infringement.").

Since Blue Gentian admits that NEI does not have all substantial rights under the patent and seeks only to join NEI as co-plaintiff, the question before the Court is whether NEI fits within category two, as an exclusive licensee with standing to sue for infringement, or in category three, and is a bare licensee with no standing to sue.

---

[6] There is an exception to the rule in which case an exclusive licensee may sue for infringement in its own name, such as where the patent holder is itself the infringer or is otherwise unable to be joined as co-plaintiff.  *See Independent Wireless Telegraph Co., v. Radio Corp. of America*, 269 U.S. 459 (1926).

**FILED UNDER SEAL**

Courts evaluate a licensee's type based on the intent of the parties and the terms of their agreement, looking beyond any labels of exclusivity. *Textile Productions*, 134 F.3d at 1484; *see also Ortho Pharmaceuticals Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1031-32 ("But it is the licensee's beneficial ownership of a right to prevent others from making using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word 'exclusive' may or may not appear in the license."). For a licensee in the first category, with all substantial rights, courts consider a long list of factors, including the exclusive right to make, use, or sell; the control of the licensor over the licensee's activities; and the licensee's freedom to assign and/or sublicense. *See Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360-61 (Fed. Cir. 2010).[7] Of special consideration for the first category is the right of the licensee to sue for infringement as compared to which rights, if any, are retained by the licensor. *Id.* Where a licensor retains the ability to sue, a licensee cannot have all substantial rights. *Id.*

Standing for an exclusive licensee, in contrast, is evaluated by the licensee's right to exclude. "To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well." *Rite-Hite*, 56 F.3d at 1552.

While several older Federal Circuit cases have considered any restriction on the licensee's exclusivity as evidence that the license is not exclusive, the Federal Circuit in *WiAV*

---

[7] As set out in *Alfred E. Mann*, courts consider a variety of factors, including "the exclusive right to make, use, and sell products or services under the patent[,]… the scope of the licensee's right to sublicense the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenances fees, and the nature of any limits on the licensee's right to assign its interests in the patent." *Id.,* 604 F.3d. at 1360 (citations omitted).

**FILED UNDER SEAL**

*Solutions LLC v. Motorola, Inc.*, held that total exclusion was not required. *Id.*, 631 F.3d 1257.

Facing a patent with a web of licenses and sublicenses, the *WiAV Solutions* Court found that the

inquiry for standing purposes was a more narrow inspection of licensee's right to exclude vis-à-

vis the alleged infringer. *Id.* at 1266 ("Because an exclusive licensee derives its standing from

the exclusionary right it holds, it follows that its standing will ordinarily be coterminous with

those rights."). As "a licensee is an exclusive licensee of a patent if it holds any of the

exclusionary rights that accompany a patent," a licensee is injured if another encroaches upon

those rights. *Id.* Therefore, a court must examine the respective rights and abilities of the

infringer to obtain a license and the licensee to exclude others. *Id.* at 1267 ("If the accused

neither possesses nor can obtain such a license, the exclusive licensee's exclusionary rights with

respect to that accused party are violated by any acts of infringement that such party is alleged to

have committed, and the injury predicate to constitutional standing is met.") The primary

question is then "whether [the licensee] has shown that it has the right under the patents to

exclude the *[d]efendants* from engaging in the alleged infringing activity and therefore is injured

by the defendants' conduct." *Id.* (emphasis in original).

    **IV.**    **Analysis**

    *A.  Standing*

        *i)  Field of Use Licensee*

Telebrands does not contest that the Agreement provides NEI the rights to make, use,

sell, offer to sell, or market the products in the markets as defined. Instead, the main thrust of its

opposition is that the markets by which the parties delineate their rights lack any identifiable

boundaries, and thus cannot create exclusivity. Opp. at 7. Telebrands argues that the Agreement

uses different criteria for each market which, in reality, creates overlap in end users and methods

**FILED UNDER SEAL**

of marketing.  *Id.*  For example, the DTC Market is defined by method of advertising – *e.g.*,

television or internet – to a consumer base whereas the Live Show Market is identified by

location, regardless of purchaser.  *Id.*  Because of the nebulous nature of the market definitions,

"Blue Gentian may license others in markets ostensibly licensed 'exclusively' to National

Express."  Opp. at 8.  Such an event would convert NEI's exclusive license into a nonexclusive

one.  *Id.*  As an exclusive licensee is defined by the patentee's promise to exclude others, the

overlap in end-users and definitions negates NEI's exclusivity.  *Id.*

  Blue Gentian argues that Telebrands' focus on the identity of the buyer is misplaced.  The

markets are defined by the point of sale in a manner that segregates Blue Gentian's markets from

NEI's markets.  Reply at 8, Docket Entry No. 60.  Furthermore, recent case law has relaxed the

standard requiring the exclusion of all other licenses.  *Id.*  Instead, under *WiAV Solutions*, the

question before the Court is whether NEI has the right to exclude Telebrands.  *Id.*  As Telebrands

is alleged to be selling its infringing product via channels specified in the Direct-to-Consumer

Market – *i.e.*, television, print, and internet – as well as through retailers such as Wal-Mart and

CVS in the Retail Market, NEI has standing to sue Telebrands for infringement.  *Id.*

  It is well settled that a patentee may divide and assign portions of the rights under the

patent.  *See* 35 U.S.C. §261; *Waterman*, 138 U.S. at 255 ("The patentee or his assigns may, by

instrument in writing, assign grant, and convey, … (2) an undivided part or share of that

exclusive right").  Patentees may also license certain claims or uses of the patented inventions.

*See, e.g., International Gamco*, 504 F.3d at 1280 (finding the licensee could not sue without the

patentee where the license covered only "lottery games" under a broader patent for a network

game system); *Trendx Enterprises, Inc., v. All-Luminum Products, Inc.*, 856 F.Supp.2d 661, 666

(D.N.J. 2012)(finding the licensee was a field of use licensee where the parties had "divided its

**FILED UNDER SEAL**

right to the patented articles based on the type of product each would manufacture and sell" into two categories of marine and non-marine products); *see also A123 Systems, Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1217 (Fed. Cir. 2010).  Here, Telebrands argues that the market definitions "are haphazard and do not define any specific field of use, as that term is used in the case law."  Opp. at 7.  As a result, the market definitions are in effect illusory.  *Id.* at 6-7.

The Court notes, however, that field of use licenses can be defined by market.  In *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938), the Supreme Court upheld market-defined field of use licenses, even where the product being sold was interchangeable between fields.[8]  *Id.* at 181.  The majority ignored the identical nature of the product entirely and focused on the terms of the license itself.  *Id.* at 181; *id.* at 184 (Black, J., dissenting).  So long as the patentee did not extend the scope of the patent monopoly, it was within the patentee's rights to grant licenses "extending to all uses or limited to use in a defined field."  *Id.*  As stated more plainly in later cases, it is the patentee's prerogative to define the terms of how its monopoly is exercised, including the types of licenses it grants.  *See Munters Corp. v. Burgess Industries, Inc.,* 450 F.Supp. 1195, 1203 (S.D.N.Y. 1977)("Since the patentee, standing alone, has the manufacturer's normal right to select his purchasers or to confine the sale of his patented article to certain areas, *see United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), as well as the patentee's 'exclusive right to make, use, and vend the invention or

---

[8] At issue was a patent for vacuum tube amplifiers used in radio and talking picture technology.  *Id.* at 176.  The patentee granted nonexclusive licenses to sell the amplifiers in the private field, which included radio broadcast receptions, radio amateur reception, and radio experimental reception, and granted exclusive licenses to the rights to sell the invention in the commercial market, which included talking picture equipment for theaters.  *Id.* at 179.  An exclusive licensee then sued a nonexclusive licensee for infringement when the nonexclusive licensee in the private field sold its product in the commercial market.  *Id.*  As the dissent noted, the amplifiers themselves were identical and completely interchangeable between fields with the only difference being a stamp identifying the designated use.  *Id.* at 184 (Black, J., dissenting).

**FILED UNDER SEAL**

discovery,' *United States v. Univis Lens Co.*, [316 U.S. 241, 250 (1942)], the patentee may condition a license for the manufacture and sale of patented article upon similar restrictions.")

Here, Blue Gentian is the undisputed owner of the patents. Blue Gentian licensed to NEI the right to make, use, and sell the patented inventions via specified channels defined by Blue Gentian. The fields of Blue Gentian's license are thus valid. The fact that a consumer may purchase a seemingly identical hose either through the internet from NEI or from a live show from Blue Gentian is inapposite. The relevant question is, as a field of use licensee, does NEI have such rights to exclude Telebrands from the markets in which it is licensed? *See WiAV Solutions*, 631 F.3d at 1266. For that answer, the Court turns to the Agreement itself.

*ii) The Right to Exclude*

Blue Gentian granted NEI "a royalty-bearing, exclusive license, including the right to sublicense, under the Licensed Patents and the Licensed Trademarks to make (or have made), use, sell, offer for sale, import, market, promote, and/or distribute Licensed Products in the DTC Market and the Retail Market in the Territory." Agreement ¶2.1. Telebrands argues that because the markets are haphazard, Blue Gentian may license to anyone any kind of license, including in NEI's markets. However, as explained above, Blue Gentian has the right to determine how it licenses its rights. By the terms of the Agreement, Blue Gentian defined the practice areas by markets. It then granted exclusive rights to NEI in the DTC and Retail Markets. Blue Gentian does not otherwise reserve the right either expressly or implied to grant licenses in the DTC or Retail markets.[9] Thus, Blue Gentian does not retain any rights to continue to license in NEI's fields of use.

---

[9] The Court addresses Telebrands' argument that other rights held by Blue Gentian nullifies any exclusivity *infra*.

**FILED UNDER SEAL**

Additionally, Blue Gentian has pled NEI's right to exclude Telebrands.  Blue Gentian granted to NEI an exclusive license to sell in the DTC and Retail Markets and did not otherwise expressly retain right to license in those markets.  *See* Countercl. ¶10.  NEI pleads in its Amended Answer and Counterclaims that Telebrands sells its infringing product in retails stores such as CVS and Wal-Mart and via direct to consumer channels such as the internet and television commercials in a manner that encroaches upon NEI's exclusive markets as defined by the Agreement.  Reply at 9-10; Countercl. ¶¶10-12.  The Court finds NEI has sufficiently pled that it has the right under the Agreement to exclude Telebrands.

### iii)  The Right to Sublicense

Telebrands also argues that NEI lacks sufficient proprietary rights, such as control over the product and the right to sublicense.  Opp. at 7-9.  Courts do consider other rights in licensing agreements to determine if other provisions undercut a party's true authority.  *See Morrow*, 499 F.3d at 1342 ("We stated that the right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded."); *see also Pfizer Inc. v. Teva Pharm. USA, Inc.*, 803 F.Supp.2d 409, 423 (E.D. Va. 2011)(weighing a list of factors such as scope of rights in a given territory, licensor's right to grant licenses, rights to sue for infringement, and rights related to the development of the invention).

To the extent that Blue Gentian retains control over the product and may inspect NEI's choices and books, such control is not inconsistent with a licensee being exclusive.  *See Delano Farms Co. v. California Table Grape Commission*, 655 F.3d 1337, 1343 (Fed. Cir. 2011)(finding the patentee a necessary party to litigation where it retained some ability to sue as well as control over the sublicensing).

16

**FILED UNDER SEAL**

Still in some circumstances, the right to assign and/or sublicense can affect a party's right to exclude. *See Morrow*, 499 F.3d at 1342. Telebrands argues that the Agreement limits NEI's right to assign and demonstrates that NEI does not "own a property right in the patents-in-suit of which it may freely dispose." *See* Opp. at 10, citing *Propat,* 473 F.3d at 1194.[10] Telebrands' focus on NEI's limitations is, however, shortsighted. The Agreement equally limits Blue Gentian and NEI. Paragraph 12.4 sets forth the terms under which both Blue Gentian and NEI may assign their respective interests under the contract: "no Party may assign any rights or delegate any duties under this Agreement without the other's prior written consent, and any such attempted assignment or delegation without such consent will be void." Neither Blue Gentian nor NEI may assign its interest without the written consent of the other. Moreover, Paragraph 2.1 grants NEI its rights under the Agreement, "including the right to sublicense," and no other provision of the Agreement explicitly limits this ability. Because Blue Gentian is prohibited from freely licensing without the consent of NEI, the limits on assignment and sublicensing do not curtail NEI's rights to exclude others from the DTC and Retail markets.

  *iv) The Right to Sue*

Paragraphs 5.4.2 and 5.4.3 of the Agreement set forth the rights of Blue Gentian and NEI respectively for patent infringement litigation. For the most part, the provisions mirror each other. The prominent difference is that Blue Gentian has "the right, but not the obligation" to sue for infringement, while NEI has "the right, at its sole discretion, to bring suit." Agreement ¶¶5.4.2 & 5.4.3. Importantly, the rights to control and settle the litigation are identical. Both

---

[10] The Court notes that in *Propat*, the licensee was found to be a bare licensee with no standing to sue. The case is distinguishable because there the license did not transfer any right to exclude others, but consisted only of the ability to license under the patent and sue for infringement. *See Propat*, 473 F.3d at 1194. Additionally, the right to sublicense was subject to consent by the patentee who could withhold its agreement arbitrarily. *Id.* In contrast, NEI has not only exclusive rights to make, use, or sell the invention in its specified markets, but also the right to sublicense.

**FILED UNDER SEAL**

paragraphs grant the party bringing the litigation "the sole right to control prosecution, and the right to settle and compromise such action with NEI's [or Blue Gentian's] prior written consent, which shall not be unreasonably withheld."  Agreement ¶5.4.2.[11]

Telebrands argues that Blue Gentian's ability to control and settle any infringement actions renders NEI's exclusivity illusory.  Opp. at 11-12.  Because Blue Gentian may settle the litigation, it thus has the option of licensing another party in the same markets as it granted to NEI.  *Id.*  However as with the right to assign, the rights to sue and settle litigation are mutually limited.  Just as Blue Gentian may settle litigation which it initiated, NEI may do the same.  Neither party is unfettered.  Both parties must seek the consent of the other party, although it may not be unreasonably withheld.  As NEI retains some ability to withhold consent, NEI's rights under the Agreement are not rendered illusory.  *See Alfred E. Mann Foundation*, 604 F.3d at 1360 (finding a licensee exclusive where the parties shared responsibility for bringing infringement suits and each retained control of any of its own self-initiated actions).

Because Blue Gentian cannot freely license others in the fields held by NEI, the Court finds that the rights Blue Gentian retained do not detract from NEI's right to exclude others such as Telebrands.

### v) Policy Considerations

Finally, Telebrands argues that the ill-defined markets raise the potential for a multiplicity of suits, subjecting it as an alleged infringer to numerous law suits for the same act of infringement.  Opp. at 12.  The Federal Circuit has provided for this concern in its prudential standing requirement of joining the patentee as co-plaintiff.  *See International Gamco,* 504 F.3d

---

[11] The corresponding sentence in NEI's paragraph states, "[i]f NEI brings legal action, NEI shall have the sole right to control prosecution, and the right to settle and compromise such action with BG's prior written consent, which shall not be unreasonably withheld." Agreement ¶5.4.3

**FILED UNDER SEAL**

at 1278-79. Blue Gentian seeks to add NEI as co-plaintiff. Thus, any concern by Telebrands of

being open to multiple suits is addressed. *See, e.g., Trendx,* 856 F.Supp.2d at 672, n.6

(commenting on the possible futility of joining the patentee where the patentee had already

litigated claims against the alleged infringer).

> B. *Motion to Amend*

As the Court finds that NEI has standing to join Blue Gentian on the patent infringement

claims, the Court turns to the standard under a motion to amend. Blue Gentian argues there has

been no prejudice or delay and Telebrands offers no opposition on these grounds.

At this stage, the Court's concern is that any amendment might going forward delay the

resolution of the entire action. This Court entered a new scheduling order on November 21,

2013, resetting the deadlines for exchange of contentions and terms. *See* Docket Entry No. 112.

Blue Gentian argues that because infringement is already at issue, "permitting National Express

to assert affirmative counterclaims for infringement of those very same patents, by the very same

product, does not expand the legal or factual issues in this case at all," and that the amendments

"will not alter the schedule in this case." Blue Gentian's Br. at 4. As the proposed amendments

do not appear to add substantially new information, the Court grants the amendment. The parties

are to note that the amendment will not be an acceptable reason to delay this case, and that all

requirements under the local patent rules must occur at an expedited pace.

> **V.    Conclusion**

For the reasons stated above, the Court finds that NEI is an exclusive licensee and has

standing to sue as a co-plaintiff with Blue Gentian for patent infringement. As the amendment

does not cause undue prejudice or delay, the Court grants Blue Gentian's motion to amend its

**FILED UNDER SEAL**

complaint to add NEI as a co-plaintiff and to add claims for indirect infringement.  An

appropriate Order shall follow.

Dated: February 25, 2014

s/James B. Clark, III

**HONORABLE JAMES B. CLARK, III**
**UNITED STATES MAGISTRATE JUDGE**